[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-13374

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 23, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 07-00921-CV-RDP

ST. PAUL FIRE AND MARINE INSURANCE COMPANY,

Plaintiff-Counter-
Defendant-Appellant,

versus

ERA OXFORD REALTY COMPANY GREYSTONE, LLC,
ERA FRANCHISE SYSTEMS, INC.,

Defendants-Counter-
Claimants-Appellees,

WILLIAM A. WALDRIP,
CHARLENE PHILLIPS,
MIKE MANACUSO,
FREDA C. JONES, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(June 23, 2009)

Before WILSON, KRAVITCH and ANDERSON, Circuit Judges.

KRAVITCH, Circuit Judge:

St. Paul Fire and Marine Insurance Company ("St. Paul") appeals the district court's order, entered upon cross-motions for summary judgment, declaring that the professional liability insurance policy issued by St. Paul to ERA Oxford Realty Greystone, LLC ("ERA") obligates St. Paul to provide a legal defense for certain claims pending in the Circuit Court for Jefferson County, Alabama (the "Underlying Lawsuit"). For the following reasons, we conclude that none of the losses alleged in the Underlying Lawsuit are covered by the unambiguous terms of the policy. Accordingly, we vacate the district court's order and remand this matter with instructions to grant St. Paul's motion for summary judgment to the extent that it seeks a declaration that St. Paul is not obligated to provide a defense to its insured.

## I. BACKGROUND

Under Alabama law,[1] whether an insurance company owes its insured a duty to provide a defense is determined primarily by the allegations contained in the

[1]A federal court sitting in diversity, as in this case, must apply the choice of law principles of the state in which it sits. In determining which state's law applies in a contract dispute, Alabama follows the principle of lex loci contractus, applying the law of the state where the contract was formed. Cherokee Ins. Co., Inc. v. Sanches, 975 So. 2d 287, 292 (Ala. 2007). We are being asked to interpret an Alabama insurance policy; therefore, Alabama substantive law applies.

complaint. United States Fid. & Guar. Co. v. Armstrong, 479 So. 2d 1164, 1168 (Ala. 1985). If the allegations in the underlying complaint show an occurrence within the coverage of the policy, then the insured is obligated to defend, regardless of the ultimate liability of the insured. Id. Accordingly, for purposes of this appeal, we consider the insurance policy's language regarding coverage and the allegations of the Underlying Lawsuit.

**The Policy**

St. Paul issued to ERA and ERA Oxford Realty Co., Inc. a Real Estate Agents or Brokers Professional Liability Protection Policy (the "Policy"). The Policy provides that St. Paul will indemnify its insured for "amounts any protected person is legally required to pay as damages for covered loss" that (1) "results from the performance of, or failure to perform, real estate professional services by you or on your behalf" and (2) "is caused by a wrongful act committed on or after any retroactive date that applies and before the ending date of this agreement." St. Paul also has the "right and duty to defend any protected person against a claim or suit for loss" covered by the Policy.

The Policy defines "real estate professional services" as "those professional services performed, or failed to be performed, for others as duties as notary public and in [the capacity of a r]eal estate agent or broker." The term "real estate agent

3

or broker" is also a defined term meaning:

> a properly licensed real estate agent or broker, including the duties of such agent or broker in any of the following capacities:
> - Member of a real estate accreditation, standards review, or similar real estate board or committee
> - Mortgage broker
> - Real estate consultant or counselor
> - Real estate leasing agent
> - Real estate referral agent

Additionally, the Policy excludes, <u>inter alia</u>, coverage for "loss that results from any criminal, dishonest, or fraudulent wrongful act or any knowing violation of rights or law committed by [] any protected person or anyone with the consent or knowledge of a protected person." The Policy also provides that St. Paul will not cover a loss: "that results from fees, deposits, commissions or other charges;" "that results from any actual or alleged violation of any securities, anti-trust, or restraint of trade laws;" or "for which any claim or suit is made or brought by or for any current or former protected person against any current or former protected person."

**Underlying Lawsuit**

On February 14, 2007, Freda Jones, Deerfoot Realty Co., Jeff and Kathy Johnson, and Johnson Realty Pros (collectively, the "Underlying Plaintiffs") brought an action against ERA, William Waldrip, Charlene Phillips, ERA Franchise Systems, Inc., and Mike Manacuso (collectively, the "ERA Parties").

4

The complaint alleges the following:

In 2006, employees of ERA approached Jeff and Kathy Johnson, licensed real estate brokers with Johnson Realty Pros, about a potential merger between ERA and Johnson Realty Pros. The parties negotiated a verbal agreement whereby the two corporate entities would merge, the Johnsons and the other agents working for Johnson Realty Pros would become agents for ERA, and the Johnsons would receive a 10% interest in the newly-formed entity. Jeff Johnson arranged for his agents to meet with William Waldrip, an owner and employee of ERA, regarding the merger. Subsequently, Waldrip informed Jeff Johnson that ERA would not complete the contemplated merger. Shortly thereafter, Johnson Realty Pros' two full-time agents left and began working as agents for ERA.

In August 2006, Deerfoot Realty Co., a brokerage operated by Freda Jones, entered into a written agreement to merge with ERA. Under the terms of this agreement, Jones would close Deerfoot Realty Co., become an agent for ERA, and receive a 10% interest in the newly-formed entity. Following the merger, Jones closed Deerfoot Realty Co. and attempted to transfer her real estate license to ERA. Thereafter, ERA breached the terms of the agreement by not providing Jones with business cards, signs, or health insurance coverage, and by not making lease payments on Deerfoot Realty Co.'s previously-leased offices. ERA also failed to

timely transfer Jones's real estate license to ERA, resulting in ERA's improper receipt of commissions earned by Jones. Waldrip later told Jones that he never had the authority to provide Jones with a 10% ownership interest in the merged entity. Jones advised Waldrip and Charlene Phillips, another ERA employee, that she would leave ERA and asked Phillips to hold her real estate license in ERA's office so she could continue to work there temporarily. Instead, Phillips mailed Jones's real estate license to the Alabama Real Estate Commission and advised the Commission that Jones was selling real estate without a license.

Based on these facts, the Underlying Plaintiffs asserted nine causes of action: (1) breach of contract based on the ERA Parties' breaches of the Deerfoot Realty Co./ERA written merger agreement and of the Johnson Realty Pros/ERA verbal merger agreement; (2) willful, reckless and/or negligent false representations based on the misrepresentations made to induce the Underlying Plaintiffs to agree to merge their businesses with ERA; (3) deceit based on Waldrip's false representations to Jones and Johnson that they would have a 10% interest in the merged entity; (4) willful concealment and/or failure to disclose based on Waldrip's failure to disclose to either Jones or Johnson that he did not have authority to grant the promised 10% interest; (5) conversion based on ERA and Waldrip's wrongful retention of commissions owed to Jones and Deerfoot

6

Realty Co.; (6) intentional interference with business relationships based on the ERA Parties' interference with Johnson Realty Pros and Deerfoot Realty Co.'s relationships with their real estate agents; (7) violation of Alabama antitrust statute, Ala. Code § 8-10-3; (8) violation of Alabama antitrust statute, Ala. Code § 6-5-60; and (9) civil conspiracy to commit the violations alleged in counts 6, 7, and 8.

## Procedural History

ERA submitted a claim to its insurance company, St. Paul, requesting provision of a legal defense to the ERA Parties in the Underlying Lawsuit and payment of any resulting damages under the Policy. In response, St. Paul filed this action in district court seeking a declaration that it owes neither a duty to defend nor a duty to indemnify the ERA Parties in the Underlying Lawsuit. St. Paul and the ERA Parties filed cross-motions for summary judgment.

The district court, granting the motions in part and denying them in part, noted that the meaning of the term "real estate professional services" was "far from clear" and that therefore the term should be given "the broadest reasonable interpretation under the policy." The court also noted that an Alabama Supreme Court case, St. Paul Mercury Insurance Co. v. Chilton-Shelby Mental Health Center, 595 So. 2d 1375 (Ala. 1992), rejected the argument that a professional liability policy covering losses resulting from a mental health center's provision of

"professional services" was triggered only upon the exercise of some "learned profession." Id. at 1377. Accordingly, the district court found that the allegations in the underlying complaint, which the court described as related to the "real estate business," described losses resulting from the provision of "real estate professional services." The court therefore declared that St. Paul had a duty to defend the ERA Parties for Counts 1, 2, 3, 4, 5, 6, and 9 of the underlying complaint, but that the exclusion for loss "that results from any actual or alleged violation of any securities, anti-trust, or restraint of trade laws" excused St. Paul from defending Counts 7 and 8, which alleged violations of Alabama's antitrust statutes.[2] The district court further found that it was premature to address whether St. Paul would be obliged to indemnify the ERA Parties.

St. Paul appeals, arguing that the district court erred in finding that the underlying complaint asserted *any* claims resulting from the performance of real estate professional services for others. St. Paul does not challenge the district court's finding that the duty to indemnify was not ripe for consideration.

---

[2] Specifically, the court held that St. Paul had a duty to defend Waldrip, Phillips, Franchise, and Manacuso from Counts 1, 2, 3, 4, 5, 6, and 9 as asserted by all Underlying Plaintiffs, but that St. Paul was only required to defend ERA with respect to Count 1 as asserted by all Underlying Plaintiffs and with respect to Counts 2, 3, 4, 5, 6, and 9 as asserted by Deerfoot Realty Co., the Johnsons, and Johnson Realty Pros. The court reasoned that because Jones was, at least temporarily, an employee or independent contractor of ERA, the exclusion in the Policy for loss resulting from "cross-suits" applied to the claims which required her to have performed real estate professional services for ERA. Accordingly, St. Paul was not obligated to defend ERA with respect to Counts 2, 3, 4, 5, 6, and 9 to the extent these claims were asserted by Jones.

## II. STANDARD OF REVIEW

The interpretation of provisions in an insurance contract is a question of law reviewed de novo.  Technical Coating Applicators, Inc. v. United States Fid. & Guar. Co., 157 F.3d 843, 844 (11th Cir. 1998).  We also review de novo a district court's grant or denial of summary judgment.  Huff v. Dekalb County, Ga., 516 F.3d 1273, 1277 (11th Cir. 2008).  Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and compels judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

## III. DISCUSSION

This diversity case requires us to determine whether real estate agents' conduct in connection with attempted mergers between real estate businesses is, under Alabama law, part of the "professional services" provided by the real estate agents, thus putting it within the coverage of the Policy.  St. Paul asserts that the underlying complaint alleges losses which did not result from the provision of services, let alone services unique to real estate agents, but which arose from common business transactions which any professional might perform.  As such, St. Paul argues that the Policy – which on its face only applies to losses resulting from the provision of "real estate professional services" – unambiguously does not

9

impose a duty to defend any party in connection with the Underlying Lawsuit. The ERA Parties disagree, arguing that the district court correctly found that the Policy was ambiguous and reasonably interpreted it broadly in favor of coverage. The ERA Parties also assert that at least some of the underlying claims are based on the ERA Parties' performance of their supervisory professional duties as qualifying brokers and that such performance constitutes the provision of professional services. As such, they assert that the district court properly declared that the Policy imposed a duty to defend in this case.

Under Alabama law, it is well established "that when doubt exists as to whether coverage is provided under an insurance policy, the language used by the insurer must be construed for the benefit of the insured." Chilton-Shelby, 595 So. 2d at 1377; see Safeway Ins. Co. of Ala., Inc. v. Herrera, 912 So. 2d 1140, 1143 (Ala. 2005) ("To the extent the language of an insurance policy provision is ambiguous, all ambiguities must be resolved against the insurance company."). It is equally well settled, however, that insurers have the right to limit their liability by writing policies with narrow coverage. Johnson v. Allstate Ins. Co., 505 So. 2d 362, 365 (Ala. 1987). If there is no ambiguity, courts must enforce insurance contracts as written and cannot defeat express provisions in a policy by making a new contract for the parties. Id.

The first issue we must consider, then, is whether the term "real estate professional services" is ambiguous as to whether it includes business-related conduct of covered real estate agents and brokers or if it is limited to those services requiring the specialized knowledge of the profession. "A term in a contract is ambiguous only if, when given the context, the term can reasonably be open to different interpretations by people of ordinary intelligence." Lambert v. Coregis Ins. Co., 950 So. 2d 1156, 1162 (Ala. 2006). The parties, however, cannot create ambiguities by setting forth different interpretations or "[by inserting] . . . strained or twisted reasoning." Twin Cities Fire Ins. Co. v. Alfa Mut.Ins. Co., 817 So. 2d 687, 692 (Ala. 2001). "Moreover, the mere fact that a word or a phrase used in a provision in an insurance policy is not defined in the policy does not mean that the word or phrase is inherently ambiguous." Safeway Ins. Co. of Ala., 912 So. 2d at 1143. "If a word or phrase is not defined in the policy, then the court should construe the word or phrase according to the meaning a person of ordinary intelligence would reasonably give it." Id. Additionally, in determining whether an insurance policy is ambiguous, "a court cannot consider the language in the policy in isolation, but must consider the policy as a whole." State Farm Fire & Cas. Co. v. Slade, 747 So. 2d 293, 309 (Ala. 1999).

The majority of courts to address the issue have concluded that the term

"professional services" unambiguously refers to services unique to a specific profession and excludes the business aspects of a professional practice that a professional happens to perform.  See, e.g., Med. Records Assocs. v. Am. Empire Surplus Lines Ins. Co., 142 F.3d 512, 514 (1st Cir. 1998) (holding that claims arising from fee-setting and billing are not covered by policy covering liability arising from the "professional services" of a "medical records processor"); Crum and Forster Managers Corp. v. Resolution Trust Corp., 620 N.E.2d 1073, 1079 (Ill. 1993) (finding no duty to defend where the underlying complaint alleged "that the insureds committed intentional business torts and engaged in unfair competitive practices" because "[t]he risk of conducting one's business in an unfair and tortious manner is certainly not one inherent in the practice of the real estate profession"); Marx v. Hartford Accident & Indem. Co., 157 N.W.2d 870, 872 (Neb. 1968) ("A 'professional' act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual.  In determining whether a particular act is of a professional nature or a 'professional service' we must look not to the title or character of the party performing the act, but to the act itself.") (internal citations omitted); Roe v. Fed. Ins. Co., 587 N.E.2d 214, 217 (Mass. 1992) (noting that this

12

standard has been "widely accepted"). Thus, under the majority view, tasks performed by a professional are not covered if they are "ordinary" activities "achievable by those lacking the relevant professional training and expertise." Med. Records Assocs., 142 F.3d at 514 (quoting Jefferson Ins. Co. v. Nat'l Union Fire Ins. Co., 677 N.E.2d 225, 230 (Mass. App. Ct. 1997)).

The district court, however, concluded that Alabama did not follow this majority rule. It noted that the Alabama Supreme Court, in St. Paul Mercury Insurance Co. v. Chilton-Shelby Mental Health Center, found that the term "professional services" included a mental health center's provision of transportation services, even though such services did not require the practice of a "learned" profession. 595 So. 2d at 1377. Noting that the Chilton-Shelby court "did not hesitate to find coverage even where there seemed to be an extremely attenuated link between the Center's core activities (providing mental health services) and the conduct that caused the loss (providing contract transportation services for a daycare)" and that "the link between the real estate 'profession' and the real estate 'business' is much stronger than the link in Chilton-Shelby," the district court concluded that "professional services" is an ambiguous term which Alabama law would interpret broadly as including a professional's business decisions. A close reading of the Alabama case, however, shows that it does not

13

support the district court's conclusion.

In Chilton-Shelby, a child died of heat stroke after an employee of the insured Chilton-Shelby Mental Health Center negligently left the child unattended in a parked van. The Center sought a defense under its professional liability policy and the insurer demurred, claiming that the Center's provision of transportation was not a covered "professional service." Id. at 1377-78. The professional liability portion of the policy at issue designated the Center as a "profession" for purposes of coverage. Id. at 1378. The Center was named under "Profession" in the Coverage Summary, and this portion of the policy stated that "claims must be based on events that arise out of the profession named in the Coverage Summary." Id. (emphasis in original). The term "professional services" was not otherwise defined in the policy. Id. Accordingly, because the policy defined "profession" as the "Center," the Alabama Supreme Court found that "[t]he intent of the professional liability portion of the policy is clear – that the Center and [its driver] are covered 'for damages resulting from professional services (i.e., transportation services)' that were being provided by the Center on the date of [the child's] death." Id. For this reason, the Court held that the policy was unambiguous and covered the claim that the Center and its employee were negligent in transporting the child.

14

We conclude that <u>Chilton-Shelby</u> stands for the limited proposition that when a policy designates an organization as a covered "profession" and the term "professional services" is not limited or defined, the policy unambiguously intends for <u>any</u> service that organization provides to be considered a professional service. This case should not be read as a blanket refutation of the majority view that the term "professional services" generally refers to those services involving specialized knowledge, labor, or skill. The Policy at issue in this case, unlike the policy in <u>Chilton-Shelby</u>, limits the definition of covered professional services to those professional services performed "for others" as duties as "a properly licensed real estate agent or broker, including the duties of such agent or broker" in his or her capacity as a mortgage broker, real estate consultant or counselor, real estate leasing agent, real estate referral agent, or member of a real estate accreditation or standards review board. The term as used in the Policy is not intended to apply across the board to <u>any</u> services provided by the ERA Parties, only to those services performed for others in these specific capacities. As such, because the policy language at issue in <u>Chilton-Shelby</u> is distinguishable from the Policy's language, this Alabama Supreme Court decision is not instructive in this case.

Upon reading the Policy in its entirety, we are persuaded that the parties intended for the term "professional services" to apply only to those services which

15

require the specialized knowledge of a real estate agent or broker in performing his or her professional duty for others. We conclude, therefore, that the unambiguous language of the Policy obligates St. Paul to provide a defense only for losses resulting from the ERA Parties' errors or omissions while acting as real estate agents or mortgage brokers, that is: while they are engaged in the sale, exchange, purchase, or lease of real estate, including any negotiations concerning the mortgage, or involved in the prospects of sale, or otherwise using their specialized expertise as real estate agents or brokers.

Turning to the allegations in the underlying complaint, it is clear from the face of the complaint that the Underlying Plaintiffs' alleged losses do not result from the ERA Parties' performance of real estate professional services. The Underlying Plaintiffs allege, in relevant part, that the ERA Parties induced them to enter into agreements to merge real estate companies and, in doing so, committed various torts including misrepresentation and deceit; that the ERA Parties breached the terms of those merger agreements; that after the merger was unsuccessful, ERA and Waldrip committed the tort of conversion by retaining real estate commissions earned by Jones and Deerfoot Realty Co.; that the ERA Parties interfered with the business relationships between the Underlying Plaintiffs and their real estate

16

agents; and that the ERA Parties engaged in civil conspiracy.[3]  None of these claims are dependent upon the ERA Parties' use of expertise as real estate agents in the sale, exchange, purchase, or rental of real estate.  The risk of committing a tort or breaching an agreement in the course of merging one business with another is certainly not one specific to the practice of the real estate profession.  See Crum and Forster Managers Corp., 620 N.E.2d at 1079.

The ERA Parties argue that the allegations that they mishandled Jones's professional license and withheld her commissions implicate their supervisory duties as qualifying brokers and that therefore at least some of the claims resulted from the provision of real estate professional services for others.  We disagree.  Although certain allegations refer to real estate matters such as the licensing of agents and the earning of commissions, these allegations go to the injury done to the Underlying Plaintiffs which resulted from the ERA Parties' allegedly tortious conduct in the aborted mergers.  The license and commissions at issue were assets belonging to Jones and Deerfoot Realty Co., and the losses related to them resulted from the ERA Parties' conduct in the unsuccessful merger, not from any error or omission in the provision of professional real estate services.  In other words, the

_____

[3] The underlying complaint also alleges that the ERA Parties violated Alabama statutes relating to restraint of trade and the creation of unlawful trusts or monopolies (Counts 7 and 8). It is undisputed on appeal, however, that St. Paul is not required to defend the ERA Parties against these allegations.

17

allegations regarding the ERA Parties' treatment of the real estate licenses and commissions do not form the genesis from which the claims first arose; rather, the alleged loss results from the misrepresentations and breaches of contract associated with the attempted merger between the real estate companies.

None of the Underlying Plaintiffs' claims are premised upon the ERA Parties' faulty performance of real estate services; rather, the claims have arisen because of the ERA Parties' allegedly tortious conduct which is ancillary to the performance of real estate services. In layman's terms, the alleged losses were incurred because the ERA Parties made misrepresentations to the Underlying Plaintiffs, enticed their employees to join ERA, and misappropriated and mishandled their business assets. All of these alleged losses could have occurred regardless of whether the ERA Parties ever provided any services to others in their capacities as real estate agents or brokers.

In comparing the coverage intended by the parties with the facts alleged in the underlying complaint, we find that such facts do not fall potentially within the coverage afforded by the Policy. To construe the Policy to cover the claims, as the ERA Parties urge us to do, would expand the coverage beyond that which was contracted for by the parties. If the evidence presented in the litigation of this case proves that the losses actually resulted from the provision of real estate

18

professional services, then St. Paul will, at that point, owe a duty to defend.

Tanner v. State Farm Fire & Cas. Co., 874 So. 2d 1058, 1065 (Ala. 2003) (noting that an insurer owes a duty to defend if either the complaint against the insured alleges a covered occurrence or the evidence in the litigation between insurer and insured proves a covered occurrence). We conclude, however, that the district court erred in finding that the allegations of the underlying complaint, by themselves, impose upon St. Paul a duty to defend any of the claims in the Underlying Lawsuit. For this reason, we vacate the district court's decision and, on remand, direct the court to grant St. Paul's motion for summary judgment to the extent that it seeks a declaration that the allegations of underlying complaint does not require it to defend the ERA Parties in the Underlying Lawsuit.[4]

VACATED and REMANDED WITH DIRECTIONS.

---

[4] Because we conclude that the Underlying Complaint does not describe claims covered by the Policy, we do not address St. Paul's argument that the Policy's exclusions also remove several of the underlying claims from coverage.

19